No. 23-10126-JJ

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔈𝔩𝔢𝔳𝔢𝔫𝔱𝔥 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

NORTH AMERICAN SUGAR INDUSTRIES INC.,

*Plaintiff-Appellant*,

v.

XINJIANG GOLDWIND SCIENCE & TECHNOLOGY CO., LTD., GOLDWIND INTERNATIONAL HOLDINGS (HK) LTD., DSV AIR & SEA INC., BBC CHARTERING USA, LLC, AND BBC CHARTERING SINGAPORE PTE., LTD.

*Defendants-Appellees*.

On Appeal from an Order of the
United States District Court for the Southern District of Florida,
Case No. 1:20-cv-22471-DPG

## OPENING BRIEF FOR PLAINTIFF-APPELLANT
## NORTH AMERICAN SUGAR INDUSTRIES INC.

William T. Reid, IV
Craig A. Boneau
Ryan M. Goldstein
Reid Collins & Tsai LLP
1301 S. Capital of Texas Hwy, C-300
Austin, Texas 78746
T: 512-647-6100
F: 512-647-6129
wreid@reidcollins.com
cboneau@reidcollins.com
rgoldstein@reidcollins.com
*Counsel for Plaintiff-Appellant*
*North American Sugar Industries Inc.*

*North American Sugar Industries Inc. v. Xinjiang Goldwind Science & Technology*
*Co., Ltd., et. al.*
Eleventh Circuit Docket No. 23-10126-JJ

## CORPORATE DISCLOSURE STATEMENT AND
## CERTIFICATE OF INTERESTED PERSONS

Plaintiff-Appellant North American Sugar Industries Inc. ("NAS") identified

its parent company as Azucar Holdings, LLC. No publicly held corporation owns

10% or more of NAS's stock.

The following persons and entities have an interest in the outcome of this

appeal:

Akerman LLP

Apollo Global Management, Inc. (NYSE: APO)

Azucar Holdings, LLC

Balmori, Daniel, Esq.

BBC Chartering & Logistic GmbH & Co. KG

BBC Chartering Carriers GmbH & Co. KG

BBC Chartering Singapore PTE Ltd.

BBC Chartering, USA, LLC

BBC Global GmbH & Co. KG

Beeber, Jessie E., Esq.

BERA GmbH & Co. KG

Boneau, Craig A., Esq.

C-1 of 6

*North American Sugar Industries Inc. v. Xinjiang Goldwind Science & Technology*
*Co., Ltd., et. al.*
Eleventh Circuit Docket No. 23-10126-JJ

Boyle, Patrick J., Esq.

BREB GmbH & Co. KG

Briese Crew Management GmbH

Briese Shipping BV

Briese, Roelf

Briese Schiffahrt GmbH & Co. KG

Briese Schiffahrts GmbH & Co. KG

Brochin, Robert M., Esq.

Carver, Christopher Stephen, Esq.

Christiansen, Jeremy M., Esq.

Cohen, Sarah Jayne, Esq.

Cuban-American Mercantile Corporation

Cuyler, Reginald, Jr., Esq.

de Almagro, Natalie Maria, Esq.

Domb, Martin, Esq.

DSV Air & Sea A/S

DSV Air & Sea Holding A/S

DSV Air & Sea Holding, Inc.

*North American Sugar Industries Inc. v. Xinjiang Goldwind Science & Technology Co., Ltd., et. al.*
Eleventh Circuit Docket No. 23-10126-JJ

DSV A/S, (DSV)

DSV A/S (OTCMKTS: DSDVY)

DSV Air & Sea Inc., (DSV)

DSV Ocean Transport A/S

DSV Panalpina A/S, (DSV)

DSV Ocean Transport A/S, (DSV)

Emden Port Agency & Stevedoring Service Beteiligungs GmbH & Co. KG

Ems Offshore Service GmbH & Co. KG

Estrada, Miguel A., Esq.

Freyre, Pedro Armando, Esq.

Gayles, Darrin P., Honorable

Gibson, Dunn & Crutcher LLP

Goldstein, Ryan M., Esq.

Goldman Sachs Group, Inc. (NYSE: GS)

Goldwind International Holdings (HK) Ltd., (002202 listed on the SZSE, 2208 listed on the HKEX)

Hexie Health Insurance Co., Ltd.

Hexion LLC

*North American Sugar Industries Inc. v. Xinjiang Goldwind Science & Technology*
*Co., Ltd., et. al.*
Eleventh Circuit Docket No. 23-10126-JJ

HKSCC Nominees Ltd.

Hogan Lovells, LLP

Hogan Lovells US LLP

JP Morgan Chase Bank, N.A.

JP Morgan Chase & Co. (NYSE: JPM)

Leto Law Firm

Leto, Matthew P., Esq.

Lee, Casey Kyung-Se, Esq.

Lorenzo, Richard C., Esq.

Mandel & Mandel LLP

Mandel, David S., Esq.

Mandel, Nina Stillman, Esq.

Marotta, Sean, Esq.

McIntosh, Elizabeth G., Esq.

Meltzer, Jason R., Esq.

Moloo, Rahim, Esq.

Morgan, Lewis & Bockius LLP

Neuman, Andrea E., Esq.

*North American Sugar Industries Inc. v. Xinjiang Goldwind Science & Technology*
*Co., Ltd., et. al.*
Eleventh Circuit Docket No. 23-10126-JJ

North American Sugar Industries, Inc.

Northsea GmbH

Otazo-Reyes, Alicia M., Honorable

Papkin, Matthew Michael, Esq.

Paull, Benjamin S., Esq.

Pegg, Allen Paige, Esq.

Reid Collins & Tsai LLP

Reid IV, William T., Esq.

Royal Dutch Shell plc

SEC GmbH & Co. Shipservices KG

Shell Oil Company

Shell plc (NYSE: SHEL)

Stempel, Danielle Desaulniers, Esq.

Sun, Timothy, Esq.

Surgeon, Naim Shakir, Esq.

Syarief, Audi K., Esq.

Talley, M. Christian, Esq.

United Fuel Services GmbH & Co. KG

*North American Sugar Industries Inc. v. Xinjiang Goldwind Science & Technology Co., Ltd., et. al.*
Eleventh Circuit Docket No. 23-10126-JJ

Valenstein, Carl A., Esq.

Vassos, John M., Esq.

Venable LLP

West India Company

Williamson, Brian, Esq.

Xinjiang Goldwind Science & Technology Co., Ltd, (002202 listed on the

SZSE, 2208 listed on the HKEX)

Xinjiang Wind Power Co., Ltd.

DATED: April 26, 2023                    Respectfully submitted,

                                         /s/ *Craig A. Boneau*
                                         William T. Reid, IV
                                         Craig A. Boneau
                                         Ryan M. Goldstein
                                         REID COLLINS & TSAI LLP
                                         1301 S. Capital of Texas Hwy, C-300
                                         Austin, Texas 78746
                                         T: 512-647-6100
                                         F: 512-647-6129
                                         wreid@reidcollins.com
                                         cboneau@reidcollins.com
                                         rgoldstein@reidcollins.com

                                         *Counsel for Plaintiff-Appellant*
                                         *North American Sugar Industries Inc.*

C-6 of 6

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Pursuant to Eleventh Circuit Rule 28-1(c), Appellant North American Sugar Industries Inc. respectfully requests oral argument. This appeal of a dismissal for lack of personal jurisdiction raises important legal and constitutional questions concerning whether the private right of action of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996—otherwise known as the Helms-Burton Act, 22 U.S.C. § 6021 *et seq.*—can be enforced in Florida against defendants who committed unlawful trafficking in or directed at Florida. Oral argument may substantially assist the Court in reviewing the factual record and resolving this appeal.

# <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENT AND  CERTIFICATE OF INTERESTED PERSONS..................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................ i

TABLE OF AUTHORITIES ........................................................................v

INTRODUCTION ....................................................................................1

JURISDICTIONAL STATEMENT .................................................................6

STATEMENT OF ISSUES .........................................................................6

STATEMENT OF THE CASE......................................................................7

I.    Factual Background ......................................................................7

    A.    Cuba's Communist Government Expropriates NAS's Property. .........7

    B.    The United States Certifies NAS's Claim to Confiscated Property. ......................................................................................8

    C.    Goldwind Contracts with Energoimport to Build a Cuban Wind Farm........................................................................................9

    D.    Exploiting an Apparent Regulatory Loophole, Defendants Route the Blade Shipments Through Miami.......................................10

    E.    Defendants Agree to Pursue the BIS Loophole Scheme. ..................12

        1.    Goldwind............................................................................12

        2.    DSV...................................................................................14

        3.    BBC Singapore ....................................................................15

        4.    BBC USA............................................................................18

    F.    Defendants Execute the Miami Stopovers, Including the Falsification of Customs Forms While in Miami...............................20

II.    Procedural History .......................................................................23

A. NAS Files Suit and Defendants Seek Dismissal for Lack of Personal Jurisdiction. ..................................................23

B. The District Court Adopts a Stale R&R and Dismisses for Lack of Personal Jurisdiction. ........................................23

STANDARD OF REVIEW ...........................................................25

SUMMARY OF THE ARGUMENT ...........................................25

ARGUMENT .................................................................................26

I. The District Court Committed Clear Error in Adopting the R&R, Which Had Been Superseded By an Intervening and Binding Decision From This Court. .............................................26

    A. The Eleventh Circuit Has Firmly Rejected the Magistrate Judge's Reasoning. .........................................................26

    B. In Adopting the R&R Wholesale, the District Court Failed to Meaningfully Distinguish Del Valle. .............................29

II. Personal Jurisdiction Exists Over All Defendants Under Florida Law. ........32

    A. Conspiracy Jurisdiction Exists Over All Defendants. .........................32

    B. Tortious Act Jurisdiction Exists Over All Defendants. ........................39

        1. Defendants Are Subject to Long-Arm Jurisdiction Because They Committed a Violation of the Act in Florida. .................39

        2. Defendants' Actions Involving Florida Were Essential to the Success of the Tort. ...............................................41

    C. The "Business Activity" Provision of Florida's Long-Arm Statute Is Satisfied as to DSV. .........................................44

        1. The District Court Erred by Relying on DSV's Self-Serving Declaration. ...................................................44

        2. Viewed Through the Proper Lens, NAS's Claims Arise From DSV's Florida Business Activities. .....................................49

III. The Exercise of Jurisdiction Does Not Violate Due Process. .......................52

A.    The Trafficking Claims Arise Out of or Relate to Defendants' Contacts with Florida. ...........................................................53

B.    Defendants Purposefully Availed Themselves of the Privilege of Conducting Activities in Florida.....................................55

C.    Jurisdiction Comports with Fair Play and Substantial Justice. ...........58

CONCLUSION .....................................................................................................59

CERTIFICATE OF COMPLIANCE.....................................................................60

CERTIFICATE OF SERVICE ..............................................................................61

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*AcryliCon USA, LLC v. Silikal GmbH*,
   985 F.3d 1350 (11th Cir. 2021)........................................................ 25, 49

*Alexander Proudfoot Co. World Headquarters v. Thayer*,
   877 F.2d 912 (11th Cir. 1989)...............................................................25

*Alston v. www.calculator.com*,
   476 F.Supp.3d 1295 (S.D. Fla. 2020)....................................................49

*AXA Equitable Life Ins. Co. v. Infinity Fin. Grp.*,
   608 F.Supp.2d 1349 (S.D. Fla. 2009)....................................................33

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) ........................................................... 5, 54, 55, 57

*Burger v. Hartley*,
   896 F.Supp.2d 1157 (S.D. Fla. 2012)....................................................38

*Cable/Home Comm'n Corp. v. Network Prods., Inc.*,
   902 F.2d 829 (11th Cir. 1990)...............................................................42

*Charles v. Fla. Foreclosure Placement Ctr., LLC*,
   988 So.2d 1157 (Fla. Ct. App. 2008) ....................................................35

*Citicorp Ins. Brokers (Marine), Ltd. v. Charman*,
   635 So.2d 79 (Fla. Dist. Ct. App. 1994)................................................50

*Del Valle v. Trivago GMBH*,
   56 F.4th 1265 (11th Cir. 2022)..................................................... passim

*Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co.*,
   752 So.2d 582 (Fla. 2000) ........................................... 32, 33, 35, 39

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*,
   141 S. Ct. 1017 (2021) ................................................................ 53, 56

*Garcia-Bengochea v. Carnival Corp.*,
   57 F.4th 916 (11th Cir. 2023)........................................................ 1, 8, 9

*Havana Docks Corp. v. Carnival Corp.*,
    592 F.Supp.3d 1088 (S.D. Fla. 2022),
    *appeal filed*, No. 23-10171-JJ (11th Cir.) .........................................................9, 36

*Herederos de Roberto Gomez Cabrera, LLC v. Teck Resources Ltd.*,
    43 F.4th 1303 (11th Cir. 2022).......................................................... 54, 57

*Koch v. Royal Wine Merchs., Ltd.*,
    907 F.Supp.2d 1332 (S.D. Fla. 2012)..................................................35

*Louis Vuitton Malletier, S.A. v. Mosseri*,
    736 F.3d 1339 (11th Cir. 2013)............................................................28

*Machtinger v. Inertial Airline Servs., Inc.*,
    937 So.2d 730 (Fla. Dist. Ct. App. 2006)............................................38

*Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*,
    288 F.3d 1264 (11th Cir. 2002)............................................................44

*Metnick & Levy, P.A. v. Seuling*,
    123 So.3d 639 (Fla. Ct. App. 2013) ....................................................39

*NHB Advisors, Inc. v. Czyzyk*,
    95 So.3d 444 (Fla. Dist. Ct. App. 2012)......................................... 38, 55

*Saft America, Inc. v. Jabil Circuit (Guangzhou), Ltd.*,
    2019 WL 4600401 (M.D. Fla. Sept. 23, 2019) ....................................52

*United Techs. Corp. v. Mazer*,
    556 F.3d 1260 (11th Cir. 2009)...................................................... 33, 38

*Walden v. Fiore*,
    571 U.S. 277 (2014) ............................................................................54

*Watts v. Haun*,
    393 So.2d 54 (Fla. Dist. Ct. App. 1981)......................................... 42, 43

*Williams Elec. Co. v. Honeywell, Inc.*,
    854 F.2d 389 (11th Cir. 1988).................................................. 39, 42, 57

## Rules

Fed. R. Civ. P. 12(b)(2)............................................................25

Fed. R. Civ. P. 4(k)(2).............................................................52

## Regulations

15 C.F.R. § 746.2 ..................................................................10

31 C.F.R. § 515.201 ...............................................................10

31 C.F.R. § 515.533(a)............................................................11

33 C.F.R. § 164.46(d) .............................................................22

## Statutes

22 U.S.C. § 1603(d) ...............................................................37

22 U.S.C. § 6005(b)(1)............................................................21

22 U.S.C. § 6022(6) .................................................................8

22 U.S.C. § 6023(13) ...........................................................9, 34

22 U.S.C. § 6023(13)(A)(ii)................................................. 37, 40

22 U.S.C. § 6023(13)(A)(iii)................................................ 37, 40

22 U.S.C. § 6023(13)(ii)...........................................................34

22 U.S.C. § 6023(13)(iii)..........................................................34

22 U.S.C. § 6081(11) ..............................................................59

22 U.S.C. § 6082(a)(2).............................................................9

22 U.S.C. § 6083(a)(1).............................................................9

22 U.S.C. § 6085(c)(2).............................................................9

28 U.S.C. § 1291 .....................................................................6

28 U.S.C. § 1331 .....................................................................6

28 U.S.C. § 1367(a) ................................................................6

28 U.S.C. § 636(b)(1)(C) .......................................................30

Fla. Stat. § 48.193(1)(a) .......................................................33

Fla. Stat. § 48.193(1)(a)(1) ...................................................49

Fla. Stat. § 48.193(1)(a)(2) ............................................. 27, 39

Fla. Stat. § 48.193(1)(a)(6) ...................................................40

**INTRODUCTION**

This is an appeal of a Rule 12(b)(2) dismissal for lack of personal jurisdiction where the evidence demonstrably shows that Defendants intentionally directed their tortious activities into the Florida forum.

In violation of the Helms-Burton Act, Defendants DSV Air & Sea Inc. ("DSV"), Xinjiang Goldwind Science & Technology Co., Ltd., Goldwind International Holdings (HK) Ltd. (together, "Goldwind"), BBC Chartering USA, LLC ("BBC USA"), and BBC Chartering Singapore Pte., Ltd. ("BBC Singapore") ("Defendants") conspired to traffic in, and then trafficked in, a Cuban port known as Puerto Carupano, property that belonged to Plaintiff North American Sugar Industries Inc. ("NAS") before the Communist revolution. *See Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 919-21 (11th Cir. 2023) (describing Helms-Burton Act and its private right of action).

Goldwind is a wind-power company. In 2013, Goldwind signed an agreement with a Cuban state-owned energy company, Empresa Importadora-Exportadora de Objetivos Electro-Energéticos ("Energoimport"), to deliver wind turbines for electrical power generation to Puerto Carupano. After entering into the agreement with Energoimport, Goldwind entered into a second agreement with LM Wind Power A/S ("LM"), a subsidiary of the American company General Electric ("GE"),

whereby LM and GE would manufacture the multi-million-dollar turbines that Goldwind would deliver to Cuba.

In 2018, and with the turbines ready for shipment, Goldwind enlisted shipping logistics and compliance vendors, including DSV, BBC Singapore, and BBC USA, to help deliver the turbines to Cuba. Because the turbines were manufactured by a subsidiary of GE and were being supplied to a Cuban state-owned energy company, Defendants conspired to attempt to exploit a regulatory gray area and circumvent the U.S. trade embargo by manipulating the route of the shipments. For nearly the entirety of 2018, Defendants concocted and then collectively implemented a scheme (the "BIS Loophole Scheme") that routed the turbines through Miami, Florida, without detection by U.S. authorities.

To successfully consummate the shipments, Defendants knew they needed a license from the U.S. Department of Treasury's Office of Foreign Asset Control ("OFAC"). From Defendants' view, there were two possible ways to get that license.

The first option was to obtain two regulatory licenses— one from the Bureau of Industry and Security ("BIS") within the Department of Commerce and one from OFAC—that would permit the shipments despite the embargo. But as Defendants quickly concluded, this option was dead on arrival. OFAC was unlikely to issue a license covering the export of American power-generating turbines to Cuba. So Defendants went with their second option—the BIS Loophole Scheme.

2

Defendants' BIS Loophole Scheme utilized the Port of Miami to manipulate the turbines' delivery to make them appear as if they were U.S. exports. Pursuant to Defendants' creative (and ultimately incorrect) interpretation of U.S. regulations, Defendants obtained only a BIS license—and no OFAC license—but then made stopovers in Miami with the turbines, because, in Defendants' view, the Miami stopovers would, with the proper misleading customs forms and paperwork, render the turbines U.S. exports. As U.S. exports, the necessary OFAC license would be "deemed" granted without Defendants ever applying for it. Thus, the Miami stopovers became the foundation and necessary precursor for Defendants successfully delivering the turbines to Cuba.

In scrutinizing the BIS Loophole Scheme, DSV, BBC USA, and BBC Singapore all expressed significant concerns regarding its legality and the risks of the Miami stopovers, including "***getting in trouble with Uncle Sam***." Despite knowing that the BIS Loophole Scheme exploited a legal gray area (at best), Defendants went full steam ahead in implementing it. Defendants proceeded to execute the BIS Loophole Scheme, including (i) planning the details of the scheme, (ii) nominating the vessels to be used for the voyages, (iii) completing and filing the necessary paperwork to qualify the Miami stopovers, including customs forms that misrepresented the vessels' end destination, (iv) finding port agents in Miami, (v) monitoring the two vessels as they docked in Miami, and (vi) keeping the vessels

in the Port of Miami, without unloading the turbines, long enough to arguably qualify as U.S. exports.

On Defendants' motion to dismiss for lack of personal jurisdiction, the district court[1] held that these facts (and more) were legally "insufficient to satisfy" any applicable provision of Florida's long-arm statute, and that the exercise of jurisdiction over Defendants would violate due process. Dkts. 277; 299. This Court should reverse.

*First*, the court justified dismissal for lack of personal jurisdiction on the idea that Defendants' trafficking occurred only "in Cuba." Dkt. 277 at 16. But the Eleventh Circuit expressly **rejected** this holding in *Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1270 (11th Cir. 2022)——an intervening decision in which this Court reversed a similar dismissal for lack of personal jurisdiction under the Florida long-arm statute. Like the defendants in *Del Valle*, who trafficked in confiscated property in Cuba by marketing their nationwide websites to Florida residents, Defendants here are subject to jurisdiction by planning and executing the BIS Loophole Scheme, which was uniquely directed at Florida and resulted in the turbines being delivered to Cuba after necessary stopovers in Miami. Moreover, because Defendants

---

[1] NAS refers to the magistrate judge's report and recommendation as the district court's because it "affirmed and adopted" the magistrate judge's decision wholesale on *de novo* review. Dkt. 299 at 5.

conspired to engage in the BIS Loophole Scheme and the trafficking in NAS's confiscated property, the district court erred by ignoring well-settled Florida law that all co-conspirators are subject to personal jurisdiction where any one co-conspirator commits a tortious act—like directing or participating in statutory trafficking—in Florida.

*Second*, the court erred in holding that the "business activity" provision of Florida's long-arm statute was not met as to DSV, which has an office in Miami, involved its Miami-based customs specialist in the Miami stopovers, and listed its Miami office as the point of contact in critical customs filings that were "the ***foundation*** of the entire project." The district court disregarded this evidence in favor of "averments" made by DSV in a post-discovery, self-serving affidavit, thereby failing to construe all reasonable inferences in favor of NAS, as is required on a Rule 12(b)(2) motion to dismiss. That is an independent reversible error.

*Third*, the court erred in concluding that jurisdiction over Defendants would violate due process. Through the BIS Loophole Scheme—which relied on Defendants' interpretation of a regulatory gray area and detours into the Port of Miami—Defendants specifically sought out Florida to "invok[e] the benefits…of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citation omitted). Defendants stopped in Miami, in other words, because they believed it was essential to complying with U.S. trade regulations as part of their scheme to deliver goods to

Cuba. That is the very definition of purposeful availment. Here again, under the clear framework articulated in *Del Valle*, 56 F.4th at 1277, the Court may plainly exercise jurisdiction over Defendants on trafficking claims related to their unlawful conduct directed at or in Florida.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 and § 1367(a) because NAS's claims under the Helms-Burton Act arise under the laws of the United States. The district court adopted the magistrate judge's report and recommendation of dismissal in a final order on December 14, 2022. Dkt. 299 at 5. NAS timely appealed on January 10, 2023. Dkt. 300 at 1. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

Did the district court err in its motion to dismiss decision when it:

1.    adopted wholesale the magistrate judge's report and recommendation despite an intervening Eleventh Circuit decision that directly contradicted and ultimately rejected the magistrate judge's earlier legal reasoning;

2.    held, contrary to Florida law, that conspiracy jurisdiction was unavailable unless a "substantial part" of the tortious conduct occurred in Florida;

3.    held that the "tortious act" provision of Florida's long-arm statute does not confer personal jurisdiction over any Defendant;

6

4.    credited DSV's self-serving declaration over contrary evidence and held that the "business activity" provision of Florida's long-arm statute does not confer personal jurisdiction over DSV; and

5.    held that exercising jurisdiction over any Defendant (notwithstanding their conduct directed at Florida and unlawful trafficking within Florida) would violate due process.

## STATEMENT OF THE CASE

### I.    Factual Background

### A.    Cuba's Communist Government Expropriates NAS's Property.

On New Year's Day 1959, Communist revolutionaries ousted the Batista government and seized control of Cuba, "nationaliz[ing] all manner of property held by foreigners and Cuban nationals alike." *Del Valle*, 56 F.4th at 1270. Among the victims of this expropriation was NAS—at the time, one of the world's largest sugar producers. Dkt. 189 ¶23. NAS's extensive operations in Cuba included a port, Puerto Carupano, and its "associated docks, warehouses, tanks, transportation facilities," and other fixtures for commercial shipping. *Id.* ¶26. Puerto Carupano served as a vital storage and transportation hub for NAS's business in Cuba. *Id.* ¶¶26-27. From its seizure in July 1960 to present day, the Cuban government has continued to use the port but never compensated NAS. *Id.* ¶¶29-34.

**B.**   **The United States Certifies NAS's Claim to Confiscated Property.**

"In response to the takings of American property in Cuba by the Castro regime, Congress amended the International Claims Settlement Act of 1949 with the Cuban Claims Act of 1964, 22 U.S.C. §§ 1643-1643k." *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th at 920. This legislation authorized the Foreign Claims Settlement Commission ("FCSC"), a body within the Executive Branch, to review claims to confiscated property filed by U.S. claimants. *Id.* In 1969, the FCSC set the value of NAS's claim at $97,373,414.72—the second-highest value certified by the FCSC. Dkts. 189 ¶36; 189-1.

In 1996, Congress passed the Helms-Burton Act ("Act") "'to protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime.'" *Garcia-Bengochea*, 57 F.4th at 920 (quoting 22 U.S.C. § 6022(6)).

The Act broadly defines trafficking as whenever a person knowingly and intentionally:

> (i) sells, …uses, or otherwise acquires or holds an interest in confiscated property; or
>
> (ii) engages in a commercial activity using or otherwise benefiting from confiscated property, or
>
> (iii) causes, directs, participates in, or profits from, trafficking…by another person, or otherwise engages in trafficking…through another person without the authorization of any United States national who holds a claim to the property.

22 U.S.C. § 6023(13). Under this broad definition, "there is no threshold level or type of trafficking activity that must occur for liability to attach under the [] Act." *Havana Docks Corp. v. Carnival Corp.*, 592 F.Supp.3d 1088, 1154 (S.D. Fla. 2022), *appeal filed*, No. 23-10171-JJ (11th Cir.)

The Act also established that the FCSC's certification of a claim is "conclusive" as to ownership, and presumptively correct as to value. 22 U.S.C. §§ 6083(a)(1), 6082(a)(2). The Act permitted the President to suspend the ability to file suit for six-month intervals. *Id.* 22 U.S.C. § 6085(c)(2). Ultimately, "Title III remained dormant for 23 years, and through three different administrations, because the right to bring an action under Title III was suspended by Presidential decree." *Garcia-Bengochea*, 57 F.4th at 919. "But in May of 2019, President Trump lifted the suspension, making Title III fully effective." *Id.* at 920. Thus, holders of certified claims can now, for the first time, enforce the Act's private right of action against unlawful traffickers.

### C.    Goldwind Contracts with Energoimport to Build a Cuban Wind Farm.

In 2013, Goldwind Science, a Chinese wind-energy conglomerate, contracted with Cuba's state-owned energy company, Energoimport, to build a wind farm in Herradura, Cuba ("Wind Farm Agreement"). Dkts. 189 ¶39; 218-2. Goldwind International acted as Goldwind Science's agent during this process. Dkts. 189 ¶46; 218-3 at 000819; 218-5 at 54:18-61, 66; 218-6 at 71:11-72, 88, 90-91; 218-7 at 18:2-

24:20; 202 at 1; 218-2 at 000595. And a Goldwind International employee signed the agreement for Goldwind Science as the latter's "authorized representative." Dkt. 189 ¶46.

Under the Wind Farm Agreement, Goldwind would deliver wind-turbine units (including the blades) to Energoimport in Cuba. Dkts. 189 ¶¶39-45; 218-2 at 000597-000609. Because Goldwind itself does not manufacture blades, it ███

████████████████████████████████████████████████████

████████████████████████████████████ Dkt. 218-8. ███

███████ █ ███████ ████████ ██████ █ █████─█

██████████████████████████████ Dkts. 218-8;

218-24 at 15. LM's status as a subsidiary of a U.S. company raised new concerns about how Defendants could comply with U.S. trade regulations while still getting the blades from China to Cuba. Dkts. 218-23 at 7; 218-50 at 8.

### D.    Exploiting an Apparent Regulatory Loophole, Defendants Route the Blade Shipments Through Miami.

For decades, the United States has maintained an embargo on trade with Cuba. Consistent with that embargo, those who export goods to Cuba containing U.S.-manufactured components, or involving U.S. entities or individuals, generally must obtain two export licenses: an OFAC and a BIS license. 15 C.F.R. § 746.2; 31 C.F.R. § 515.201. OFAC licenses can be difficult to obtain. Dkt. 218-25 at 2-3. But, under

one reading of the regulatory regime (likely not applicable to the turbines),[2] a shipment covered by only a BIS license will be deemed to have OFAC authorization if the goods are of a certain category and exported to Cuba as an export "*from* the United States." 31 C.F.R. § 515.533(a) (emphasis added). Determining that obtaining an actual OFAC license was impossible, Goldwind ignored the terms of the underlying Wind Farm Agreement—███████████████████████████ ████████—and instead, along with the other Defendants, executed the BIS Loophole Scheme. Dkts. 218-2 at 000606; 218-11 at 0009000; 218-13 at 000877; 218-24 at 2-15; 218-23 at 7; 218-26 at 97:10-19; 218-28 at 2-3; 218-5 at 137:1-20; 218-44 at 3-4. But to utilize the single BIS license, Defendants would have to qualify the turbines—manufactured in China—as U.S. exports.

Thus, Defendants concocted and participated in the BIS Loophole Scheme to: (1) ship the turbines on two vessels from China to Miami; (2) file Importer Securities Filing form 5s ("ISF-5") so that the turbines could enter the Port of Miami and remain on board the vessels; (3) keep the vessels with the turbines on board in the Port of Miami long enough to qualify the turbines as U.S. exports; and then (4) ship the turbines from Miami to the confiscated property at Puerto Carupano, in Cuba, as U.S. exports under a BIS license.

---

[2] NAS disputes that Defendants complied with U.S. law.

### E.     Defendants Agree to Pursue the BIS Loophole Scheme.

Under the Wind Farm and Blade Supply Agreements, Goldwind was responsible for delivering turbines to Energoimport. *See supra* at 10. Goldwind enlisted DSV Denmark, a Danish shipping and logistics company, to assist. DSV Denmark, in turn, engaged its U.S. affiliate, Defendant DSV—which conveniently operates an office in Miami—for U.S.-related logistical and compliance assistance. Dkt. 218-24 at 15. DSV's mission was to navigate thorny regulatory issues related to the Miami stopovers. Dkt. 218-31 at 3. Shortly thereafter, DSV's Danish affiliate engaged BBC Carriers, a shipping and logistics company, that through its affiliates, Defendants BBC USA and BBC Singapore, provided additional shipping logistics assistance, including organizing the use of the Jade and Moonstone, the vessels ultimately used to ship the turbines to Miami. Dkts. 189 ¶¶21-22; 50-2 at 2. As set forth below, each Defendant scrutinized, endorsed, and knowingly participated in the BIS Loophole Scheme, thereby "trafficking" under the Act.

### 1.     Goldwind

Goldwind recognized that unless it attempted to satisfy U.S. trade law with the stopovers, it could not get the blades to Cuba. Dkts. 218-5 at 137:1-6; 218-7 at 53-54. In fact, Goldwind expressly agreed to the Florida stopovers as necessary pre-conditions to entering the Blade Supply Agreement with LM, demanding to review the license before signing the Blade Supply Agreement despite the Wind Farm

Agreement with Energoimport ████████████████████████████████

Dkts. 218-11 at 000900; 218-13 at 000877; 218-2 at 000606; 218-5 at 137:1-20; 218-7 at 53:20-54:2; 218-44 at 3-4. Goldwind itself is listed as the "Purchaser" and "Approved End User" on the BIS license, for a purchase of GE/LM blades valued at $10.34 million. Dkt. 218-17. Goldwind sent the BIS license to Energoimport for review and fielded its related questions. Dkts. 218-14; 218-16.

For months, Goldwind meticulously planned the stopovers with the other Defendants. By September 2018, Energoimport was impatient about the lack of details about the blades. In internal emails and messages with LM, Goldwind repeatedly acknowledged that the route would require stopovers in Miami "to be in accordance with the requirements of the United States." Dkt. 218-44 at 3-4. The Miami stopovers were essential to a successful delivery to Puerto Carupano for Goldwind—so essential that Goldwind pursued them despite the risk that the stopovers could expose Goldwind to legal consequences such as the vessels being detained in Miami. Dkt. 218-46 at 2 Given this risk, Goldwind International procured insurance underwritten by a U.S. insurer. Dkt. 218-75 at 2-4. And it submitted export-control declarations on Goldwind Science's behalf, reflecting that Goldwind understood the shipments were subject to U.S. sanctions laws, and that it would indemnify DSV against losses arising from the failure to declare contraband. Dkts. 218-91; 218-93.

## 2.    DSV

Numerous U.S.-based DSV employees from DSV's Florida and New Jersey offices were involved for the duration of the BIS Loophole Scheme. Given that the legality of the BIS Loophole Scheme was an "Interesting Scenario" and "a real head scratcher," DSV, from the outset, involved a team of high-ranking employees in the matter, including: Ken Witkowski (Director of Quality and Compliance); Robert Boswell (Customs Compliance Manager); Paulette Kolba (Customs Specialist); and Carol Scheid (Miami-based Customs Specialist). Dkts. 214-24 at 7, 14-16; 218-30 at 2. DSV scrutinized the BIS Loophole Scheme for months and required approval from its compliance department to participate. Dkt. 218-29 at 2-19.

Moments after receiving the initial inquiry from its Danish affiliate, Boswell forwarded it to Witkowski and Scheid. Dkt. 218-30 at 13. Thereafter, Witkowski noted that shipping the turbines, which were manufactured by the subsidiary of an American company, to Cuba was a "very complex issue" that most likely required "OFAC authorization." *Id.* at 6. Yet after significant analysis by its U.S. personnel and despite understanding that the shipment required OFAC authorization, DSV participated in the BIS Loophole Scheme. *Id.*; Dkt. 218-26 at 97:10-19. DSV knew, as Kolba aptly put it, that the BIS Loophole Scheme involved "manipulating the routing of the vessel" to "'qualify' for a [OFAC] license" by "representing th[e] shipment] to be a U.S. export." Dkt. 218-30 at 2.

14

Aware of the true nature of the BIS Loophole Scheme, DSV prepared and filed various documents to satisfy the BIS license. Dkt. 218-24 at 2. These included: (1) the essential ISF-5; (2) an Automated Manifest Form; and (3) a statement of facts signed by the master of the vessel and agent in U.S. port. *Id.* Acknowledging that these forms—particularly the ISF-5—were "***the foundation*** of" the BIS Loophole Scheme, and given that the BIS Loophole Scheme used the Port of Miami as its U.S. touchpoint, DSV repeatedly used its Miami office address in connection with the forms. Dkt. 218-51 at 8 (emphasis added). Specifically, DSV used its Miami office address on the two ISF-5s prepared for U.S. Customs in connection with the Jade's Miami stopover and two letters addressed directly to Energoimport regarding the importance of the ISF-5s. Dkts. 218-47 at 3; 218-48 at 3.

### 3.    BBC Singapore

BBC Singapore scrutinized the BIS Loophole Scheme and decided to participate despite significant concerns regarding its legality. In March 2018, BBC Singapore was informed that "the vessel [would] have to go to a US port to get some documents validated," that "the cargo is not to be discharged," and "then the vessel [would] go to Cuba." Dkt. 218-32 at 46. By June 2018, BBC Singapore understood that Defendants had acquired the BIS license and that the BIS License Scheme was underway. *Id.* at 42. Contemporaneous emails demonstrate that BBC Singapore understood the purpose and mechanics behind the Miami stopovers: keep the

turbines on board the ship without unloading them long enough for Defendants to "arrange" the "paperwork" to qualify the turbines as U.S. exports "before going to Cuba." *Id.*

Accordingly, BBC's Chartering Manager, Randall Sullivan, assigned with "looking after th[e] shipment from China into Cuba," was aware that the shipments would feature stopovers in Miami. Dkts. 218-21 at 31:5-17; 218-32 at 34-35. Sullivan was also tasked with seeking a review of the BIS license by BBC Singapore's legal department, stating: "I've sent the info to legal…. I've never done Cuba before…. But looks good enough for me!" Dkt. 218-32 at 4. Sullivan actively monitored the success of the shipments' arrival and departure from the Port of Miami. Dkt. 218-54 at 4. Understanding that the BIS Loophole Scheme took advantage of a regulatory gray area and concerned it would draw negative attention to BBC Singapore, Sullivan emailed BBC personnel that "[t]he US is a HUGE market for BBC and DSV" and "**we should NOT market this shipment publicly**…" because "the current political climate in the US would not side with us on a potentially 'un-sanctioned' shipment to Cuba." Dkt. 218-32 at 2.

Sullivan kept tabs on the various critical documents (*i.e.*, ISF-5s and BIS license) needed to successfully consummate the BIS Loophole Scheme. He inquired on BBC Singapore's behalf whether "dsv ever show[ed] us evidence (export license or whatever) that this was a non-sanctioned cargo?" Dkt. 218-32 at 11. He also

16

colorfully explained concerns that the stopovers in Florida were some sort of "weird global trade circle jerk" because he had "a hard time seeing why [turbines] would be excluded when the rest of their [*i.e.*, Cuba's] power gen industry is sanctioned." *Id.* That same day, BBC Singapore, again via Sullivan, conferred with a U.S. company, Dan-Gulf Shipping, about whether it was possible to "clear" a shipment in Miami to avoid "***getting in trouble with uncle sam***." Dkt. 218-33 at 2 (emphasis added). Copying Ed Andersen, BBC USA's general counsel, on the email, Sullivan confirmed that: (1) BBC Singapore was working with DSV and Goldwind; (2) BBC Singapore understood the blades were manufactured by the subsidiary of an American company; and (3) the blades were destined for Cuba, via Miami. *Id.*; 218-35 at 19:8-14.

Recognizing the cited concerns with the BIS Loophole Scheme, BBC Singapore executed a formal chartering agreement with DSV's Danish counterpart to ship the turbines from China to Cuba. Dkt. 50-2. A rider to that agreement, signed and stamped by BBC Singapore, expressly provided for the ships to proceed from "Tianjin, Lingang terminal via Miami, US to Carupano, Cuba." Dkt. 50-2 at 4-8. And in October and November 2018, BBC Singapore formally ███████████ and Moonstone to transport the turbines in accordance with the BIS Loophole Scheme. Dkts. 218-36 at 2; 218-37 at 3.

17

BBC Singapore utilized two Florida-based port agents, USA Maritime Enterprises ("Maritime") and Seaport Hub Agencies, to act on its behalf in Miami, and tasked those agents with overseeing the Jade's stopover. Dkts. 218-55 at 2-3; 218-56 at 2. On January 1, 2019, after the Jade departed Miami, Sullivan confirmed BBC Singapore's use of Maritime as its Florida agent, thanking it in a congratulatory email "for getting *my BBC Jade pushed through Miami*," and informing Maritime that BBC Singapore was "happy with the service you guys provided BBC" in the Port of Miami. Dkt. 218-54 at 4 (emphasis added). In response, Maritime confirmed that after BBC Singapore provided it with the necessary shipment information, Maritime: (1) contacted U.S. Customs; (2) submitted necessary paperwork and licenses to U.S. authorities; and (3) organized the berthing and arrival for the Jade on BBC Singapore's behalf. *Id.* at 2. The information from the Jade's successful shipment was then forwarded to BBC Carriers to provide "lessons learned" for the Moonstone's voyage. *Id.*

### 4.    BBC USA

BBC USA also directly participated in the months-long planning, scrutinization, and ultimate consummation of the BIS Loophole Scheme.

BBC USA, by its own admission, serves as an agent for BBC Carriers, the BBC entity originally engaged by Goldwind, in connection with United States ports, including the Port of Miami. Dkt. 197 at 5-6. ████████ BBC USA, like BBC

Singapore, was informed that █████████████████████████████████

█████████████████ that ████████████████████████ and that ███████████

█████████████████ Dkt. 218-39 at 002656. ██████████ BBC USA also

████████████████████████████████████████████████████████████████

█████████████ *Id.* at 002652. BBC USA also once again understood the purpose and

procedures of the Miami stopovers: keep the turbines on board the ship without

actually unloading them just long enough so that Defendants could ██████████ the

████████████████████████████████████████████████████████████ *Id.*

Contemporaneously, BBC USA tracked the proposed voyage details of the Jade and

Moonstone shipments, understanding it to be: █████████████████████████

███████████████████████████ and received further instructions from

BBC Carriers that ██████████████████████████████████████████

███████████████ *Id.* at 002644, 002624.

In November 2018, BBC USA tasked its customs documentation specialist,

Beverly Scott, to review and approve a BIS/OFAC analysis underlying the BIS

Loophole Scheme, along with the scheme's foundational documents. Dkt. 218-42 at

2-9. Scott, acting for BBC USA, thereafter approved the BIS/OFAC analysis along

with BIS Loophole Scheme's foundational documents and stopovers in Miami. *Id.*

at 2.

BBC USA's involvement did not stop there. BBC USA directly participated in the logistics of loading and unloading the turbines from the vessels. Specifically, BBC USA's Vice President, Ivo Damman, was instructed, along with members of BBC Singapore's team, regarding one of DSV's "spreaders" which was to be "assembled" and loaded on the Jade in "tinajin" China, transported through the Port of Miami, and then used to "discharge[e] the blades" in Cuba at Puerto Carupano "for the DSV account." Dkt. 218-40 at 2-3. Moreover, after the "spreader" was used for the Jade shipment, it was to be left "in carupano for [the Moonstone shipment]." *Id.* After receiving the spreader instructions, Damman forwarded the instructions, along with "photos, drawings, and test certificates" for operating the spreaders to other members of BBC USA's team. *Id.*

### F. Defendants Execute the Miami Stopovers, Including the Falsification of Customs Forms While in Miami.

The Jade set sail from Tianjin on November 15, 2018, and arrived in Miami on December 30, 2018. Dkt. 189 ¶¶87, 89. After clearing customs, resupplying, and refueling in Miami, the Jade left for Cuba the next day. *Id.* ¶92. The ship arrived in Puerto Carupano on January 6, 2019, where, using NAS's port, it unloaded the blades and components purchased by Energoimport. *Id.* ¶93. The Jade left Cuba three days later. *Id.* ¶94.

The Moonstone's voyage was more complex. In addition to the wind-turbine components slated for delivery to Puerto Carupano, it had been chartered by another

of BBC USA's clients to deliver a subsequent, unrelated shipment to Port Arthur, Texas. Dkt. 218-64. But this second destination posed major problems. BBC Singapore and BBC USA had not warned their other American client that its own shipment would be making a detour into Cuban waters. *Id.* And, as BBC Singapore understood, U.S. law bars a vessel departing a Cuban port without an OFAC license from unloading cargo in a U.S. port for six months after that departure. Dkt. 189 ¶106; 22 U.S.C. § 6005(b)(1). So, Defendants concealed the journey's Cuban leg to accomplish the stops in both Puerto Carupano and Port Arthur.

*First*, Defendants submitted false and misleading customs documents to U.S. Customs officials in Miami. The Moonstone Inward Cargo Declaration for the Miami stopover, for instance, falsely listed its Port of Discharge for the wind-turbine components as "MIAMI, US," rather than Puerto Carupano. Dkt. 218-58. Likewise, the Moonstone's Vessel Clearance and Entrance Statement, submitted to and approved by customs officials in Miami—who prominently stamped the documents in "MIAMI, FLORIDA"—falsely represented its final destination as "Rio Haina" (a Dominican Republic port) rather than Puerto Carupano. Dkt. 50-6 at 2-3.

BBC Singapore expressly endorsed this plan. BBC Singapore's Chartering Manager, Sullivan, specifically requested a "'*fake*' version" of the Moonstone's plan "showing the blade pod [*i.e.*, port of discharge] as Rio Haina (and not Carupano)." Dkt. 218-59 at 3 (emphasis added). Sullivan admitted that the falsified documents

were being prepared "just so the USA client does not see we're going to cuba :)." Dkt. 218-60 at 2. BBC USA's Vice President, Damman, also approved the use of "Rio Haina" as a stand-in for Puerto Carupano, despite knowing that the Moonstone would never stop there. Dkts. 218-67 at 2; 218-35 at 122: 10-16. Last, directly before the Port Arthur stop, a BBC USA document specialist generated another false Inward Cargo Declaration, listing the "Last Foreign Port" before Port Arthur as "TIANJIN," rather than Puerto Carupano. Dkts. 218-68; 218-69 at 2-6 218-35 at 177:9-179:11.

*Second*, after departing Miami, the Moonstone deactivated its electronic tracking systems in violation of U.S. law, 33 C.F.R. § 164.46(d), to conceal its voyage to Puerto Carupano. Dkts. 218-62 at 2. It did so at the direction of BBC Singapore, Dkt. 218-64, who initially considered shuttering the systems during the voyage *into* Miami, before concluding that doing so could cause "trouble with the U.S. coast guard" and draw unwanted "attention" to their shipment. Dkt. 218-62 at 3. If the deactivation caused any unwanted inquiry, BBC Singapore decided they would tell "***a little lie***." Dkt. 218-62 at 2 (emphasis added). The Moonstone delivered the turbines to Puerto Carupano on February 4, 2019, then—Cuban detour undetected—delivered its Port Arthur shipment on February 10. Dkt. 189 ¶¶115-16.

22

## II.    Procedural History

### A.    NAS Files Suit and Defendants Seek Dismissal for Lack of Personal Jurisdiction.

On June 15, 2020, NAS asserted trafficking claims against Defendants in the Southern District of Florida. Dkt. 1. Defendants objected to personal jurisdiction, portraying any nexus to Florida or the United States as arbitrary and fortuitous. Dkts. 48; 52; 53. Following jurisdictional discovery, NAS amended its complaint with extensive documentary and testimonial evidence demonstrating Defendants' extensive planning and involvement in effectuating the BIS Loophole Scheme and the centrality of Florida thereto. Dkt. 189. Defendants then renewed their motions to dismiss. Dkts. 197; 198; 201; 202.

### B.    The District Court Adopts a Stale R&R and Dismisses for Lack of Personal Jurisdiction.

The district court referred the motions to dismiss to a magistrate judge, who recommended dismissal of NAS's claims. Dkt. 277. In the report and recommendation ("R&R"), the magistrate judge rejected each basis of long-arm jurisdiction put forward by NAS, and additionally held that the exercise of jurisdiction would violate due process.

*First*, as to DSV, the magistrate judge credited a self-serving declaration over contrary evidence put forward by NAS and held that NAS failed to establish any nexus between DSV's Miami activities and the trafficking claim. *Id.* at 10-12.

23

*Second*, as to all Defendants, the magistrate judge held that the "tortious act" provision of Florida's long-arm statute does not confer jurisdiction. In so holding, the court failed to apply this Court's later analysis in *Del Valle*, including that a defendant who takes actions in or directed at Florida to benefit from trafficking in confiscated Cuban property is subject to jurisdiction. *Id.* at 12-14.

*Third*, the magistrate judge held that conspiracy jurisdiction was unavailable because NAS failed to show that a substantial part of the alleged trafficking occurred in Florida. *Id.* at 18-19. But conspiracy jurisdiction does not require a showing that a substantial part of the tort occurred in Florida, particularly where, like here, the Defendants conspired to commit a statutory violation within Florida.

*Finally*, the magistrate judge held that even if long-arm jurisdiction existed, the exercise of jurisdiction over any Defendant would violate due process. *Id* at 15-18. This holding was again contrary to *Del Valle*.

NAS sought *de novo* review. Dkt. 282. While NAS's objections were pending, this Court issued *Del Valle*, 56 F.4th 1265. There, the Eleventh Circuit reversed an order dismissing Helms-Burton claims against out-of-state online booking websites for lack of personal jurisdiction, holding that the plaintiffs' trafficking claims arose from defendants' tortious acts in Florida and that the exercise of jurisdiction comported with due process. The Court also specifically rejected the concept—

24

embraced throughout the opinion below—that trafficking necessarily occurs only "in Cuba." 56 F.4th at 1273.

Notwithstanding the intervening *Del Valle* decision, the district court wholesale adopted the R&R. Dkt. 299 at 1-5. Although it claimed to be performing *de novo* review, the court's only independent analysis was in a footnote that misconstrued *Del Valle* and misdescribed the facts of that case. *Id.* at 4 n.3.

## STANDARD OF REVIEW

This Court reviews "the dismissal of an action for lack of personal jurisdiction under the nondeferential *de novo* standard." *Alexander Proudfoot Co. World Headquarters v. Thayer*, 877 F.2d 912, 916 (11th Cir. 1989). The Court "accepts as true all unchallenged facts from the complaint," and to the extent the parties' evidence conflicts, "the court must construe all reasonable inferences in favor of the plaintiff." *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1364 (11th Cir. 2021); *Del Valle*, 56 F.4th at 1271 (describing "plenary review as to the district court's dismissal for lack of personal jurisdiction"); *see also* Fed. R. Civ. P. 12(b)(2).

## SUMMARY OF THE ARGUMENT

The district court committed numerous clear errors, including by adopting wholesale the R&R that had been superseded by an intervening and binding decision from this Court in *Del Valle*. Properly applying *Del Valle*, the district court should have held that personal jurisdiction exists over all Defendants.

As an initial matter, all Defendants are subject to conspiracy jurisdiction under Florida law because NAS clearly meets the burden of showing that one or more of them committed at least one act in furtherance of the conspiracy in Florida. Indeed, NAS demonstrated that each Defendant committed a "tortious act" in Florida within the meaning of both the Helms-Burton Act and the "tortious act" provision of Florida's long-arm statute, creating an additional basis for jurisdiction over all Defendants. NAS also established that, at a minimum, DSV's business activities in Florida provide personal jurisdiction over DSV.

Finally, the exercise of personal jurisdiction here does not violate due process since Defendants agreed to engage in a scheme that involved tortious acts in Florida with the understanding that doing so would subject them to suit in Florida. Because personal jurisdiction exists here, the order dismissing this case must be reversed.

## **ARGUMENT**

I. **The District Court Committed Clear Error in Adopting the R&R, Which Had Been Superseded By an Intervening and Binding Decision From This Court.**

A. **The Eleventh Circuit Has Firmly Rejected the Magistrate Judge's Reasoning.**

When issuing the R&R, the magistrate judge did not have the benefit of any Eleventh Circuit decisions concerning the scope of Florida's long-arm statute in connection with trafficking claims brought under the Act. The magistrate judge

26

therefore analyzed NAS's state-law jurisdictional arguments against what ended up being an incorrect legal standard.

Focused solely on the end destination of Defendants' unlawful conduct, the magistrate judge held that the alleged trafficking occurred only "*in Cuba*." Dkt. 277 at 14 (emphasis added). In the court's view, because the claims against Defendants did not arise out of the trafficking "in Cuba," jurisdiction in Florida was unavailable.

Months later, the Eleventh Circuit issued *Del Valle*. There, the issue was whether out-of-state online booking agencies like Expedia were subject to jurisdiction in Florida when they facilitated reservations at hotels located on confiscated property in Cuba. 56 F.4th at 1271. The Court held that the booking agencies were subject to jurisdiction under § 48.193(1)(a)(2) of Florida's long-arm statute, since the plaintiffs' trafficking claims arose from the defendants' tortious acts in Florida. In support of this holding, the Court cited allegations that the booking agencies promoted their websites to Florida residents; Florida residents could and did use the websites to book accommodations at the hotels in Cuba; and the agencies received commissions and other indirect benefits from these activities. *Id.* at 1272.

In *Del Valle*, this Court expressly ***rejected*** the conclusion—repeated by the magistrate judge here—"that the tort at the heart of the Helms-Burton Act claims against the [booking agencies] is 'trafficking in…confiscated property, ***which occurred in Cuba*.'**" *Id.* at 1273 (emphasis added). On the contrary, the Eleventh

Circuit held that "the trafficking underlying the Helms-Burton Act claims against the [booking agencies] involves Florida residents using their commercial websites to book lodging at the Resorts that now stand on the confiscated properties." *Id.* The Court emphasized that the trafficking occurred when the booking agencies—which never set foot in Cuba—profited from web traffic generated by Florida residents, explaining that "[a]t the very least, **some** of the alleged trafficking took place when Florida residents accessed the websites and made reservations at one or more of the Resorts through those websites." *Id.* at 1274 (emphasis added).

*Del Valle* further held that jurisdiction over the booking agencies comported with due process. First, the trafficking claims arose "at least in part directly out of the contacts of the [booking agencies] with Florida—the promotion targeted at and directed to Florida residents, the accessing of their websites by Florida residents, and the use of those websites by some Florida residents to book accommodations at the Resorts." *Id.* at 1275. Second, purposeful availment was met, since the agencies' contacts with Florida were related to the plaintiffs' claims and the agencies directed their activities towards Florida and secured direct financial benefits.[3] *Id.* at 1276-77.

---

[3] The Eleventh Circuit favorably cited *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339 (11th Cir. 2013). The decision below also cited *Louis Vuitton* but held that it *barred* jurisdiction over Defendants. *Compare* Dkt. 277 at 15-16, *with Del Valle*, 56 F.4th at 1273 ("We…conclude that *Louis Vuitton* is a closer fit than the district court thought.").

Thus, on both the "tortious act" provision of Florida's long-arm statute and due process, *Del Valle* firmly rejected the magistrate judge's legal reasoning. Like the plaintiffs in *Del Valle*, who alleged that out-of-state traffickers were subject to jurisdiction in Florida by virtue of (i) directing marketing into Florida which then (ii) resulted in ***individuals in Florida*** using the hotel-booking websites to secure reservations at hotels in Cuba, NAS alleges that out-of-state traffickers are subject to jurisdiction in Florida by virtue of (i) directing their BIS Loophole Scheme at Florida and then (ii) individually or though agents, ***using a physical port in Florida*** to get around U.S. trade law requirements. If out-of-state actors with nationwide activities like the booking agencies can be haled into Florida court based on Florida residents using their websites, surely Defendants here—who do not dispute that they effectuated necessary stopovers in Miami that were the "foundation" of their trafficking—are equally subject to jurisdiction. But because the magistrate judge wrongly viewed the only relevant conduct as occurring "*in Cuba*," and without the benefit of the intervening *Del Valle* decision, the R&R conducted an erroneous legal analysis and therefore failed to reach these straightforward conclusions.

**B.    In Adopting the R&R Wholesale, the District Court Failed to Meaningfully Distinguish Del Valle.**

NAS objected to the R&R, and the Eleventh Circuit issued *Del Valle* while the objections were pending (NAS promptly submitted the case a supplemental authority). Dkts. 282; 297. *Del Valle* reversed a similar district court opinion that

Florida courts lacked jurisdiction over out-of-state defendants for trafficking claims, and therefore was particularly germane as a supplemental authority. At the very least, the intervening decision should have resulted in a rigorous *de novo* review of the R&R, which had been effectively superseded. 28 U.S.C. § 636(b)(1)(C) (district court "shall make a de novo determination" and "may also receive further evidence").

But the district court did not perform any meaningful *de novo* review, order supplemental briefing, or schedule oral argument. Instead, the district court "adopt[ed] [the magistrate judge's] well-reasoned findings and conclusion that the claims against Defendants should be dismissed for lack of personal jurisdiction." Dkt. 299 at 4. The court further "AFFIRMED AND ADOPTED" the entirety of the R&R, and formally incorporated it into its dismissal order. *Id.* at 5.

In a footnote, the district court attempted to distinguish *Del Valle*. *Id.* at 4 n.3. But the footnote is nothing close to *de novo* review. Rather, the footnote fundamentally misconstrued and misread *Del Valle* and drew illusory and counterfactual differences between that case and this one. According to the district court's footnote, the key jurisdictional finding in *Del Valle* was that the "plaintiffs were Florida residents and alleged that (1) the defendants ***targeted them***, in Florida, through emails and advertising; (2) ***the plaintiffs used defendants' websites*** to book hotels in Cuba, and (3) the defendants earned a "substantial part" of their revenue

from Florida residents." *Id.* (emphasis added). In other words, the district court's apparent "takeaway" from *Del Valle* was that the defendants targeted the plaintiffs in Florida.

*Del Valle* does not stand for these factual or legal propositions. Rather, the plaintiffs in *Del Valle* were, like NAS, holders of claims to confiscated property in Cuba. For purposes of jurisdiction, *Del Valle* analyzed the use of the defendants' booking websites by ***other*** Florida residents (not the plaintiffs)—*i.e.*, those who reserved rooms at hotels on confiscated property. 56 F.4th at 1273. What mattered was the connection between the agencies' trafficking conduct and Florida—not that that defendants solicited or had any relationship with the *plaintiffs* in Florida. Indeed, the facts are stronger here: unlike the booking agencies, which operated nationwide websites from outside of Florida, Defendants here ***specifically chose*** to direct the BIS Loophole Scheme into Florida as the "foundation" of their trafficking, shipped the offending turbines through Florida, and directly profited from the use of a physical Florida port.

The district court's footnote also distinguished *Del Valle* as based on allegations in a complaint, rather than with the benefit of jurisdictional discovery. This is backwards. Unlike the *Del Valle* plaintiffs, who were alleging that Florida residents used the websites to reserve rooms, jurisdictional discovery here showed Defendants' ***actual commission of trafficking in Miami*** and how the stopovers in

Florida were the linchpin to their successful scheme. But the district court simply ignored NAS's evidence in favor of conclusory remarks about the location of the alleged trafficking "in Cuba"—a framework that *Del Valle* expressly rejected.

In short: *Del Valle* controls, and this Court need not go further to reverse and remand.

## II.    Personal Jurisdiction Exists Over All Defendants Under Florida Law.

### A.    Conspiracy Jurisdiction Exists Over All Defendants.

The district court's misapprehension of *Del Valle*'s analysis of what constitutes trafficking under the Act is apparent in its rejection of conspiracy jurisdiction "over the Defendants because Plaintiff has not established that Defendants committed a tortious act in Florida in furtherance of the alleged conspiracy." Dkt. 299 ¶3. For purposes of analyzing conspiracy jurisdiction, any single statutory violation that occurred in Florida in furtherance of the conspiracy qualifies as a "tortious act" that confers Florida jurisdiction against all co-conspirators, as the Florida Supreme Court has held. *Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co.*, 752 So.2d 582, 585 (Fla. 2000) (finding that defendant and its co-conspirators "committed a tortious act (i.e., a violation of the Act) on Florida soil and subjected themselves to the jurisdiction of Florida courts").

Moreover, "Florida law construes the state's long-arm statute to reach all of the alleged participants in a civil conspiracy, at least one act in furtherance of which

is committed in Florida." *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp.*, 608 F.Supp.2d 1349, 1354 (S.D. Fla. 2009); *see also United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1281-82 (11th Cir. 2009) ("Florida courts have held that the state's long-arm statute can support personal jurisdiction over any alleged conspirator where any other co-conspirator commits an act in Florida in furtherance of the conspiracy, even if the defendant over whom personal jurisdiction is sought individually committed no act in, or had no relevant contact with, Florida."). And Florida's long-arm statute does not distinguish between a tortious act committed by a defendant directly and one accomplished "through an agent." Fla. Stat. § 48.193(1)(a).

Accordingly, NAS merely had to establish for purposes of personal jurisdiction over all Defendants that a single co-conspirator, either directly or through an agent, committed an act in Florida in furtherance of the conspiracy that, standing alone, amounts to a trafficking violation. *Execu-Tech*, 752 So.2d at 583-85 (co-conspirators engaged in nationwide price-fixing conspiracy violated Florida Deceptive and Unfair Trade Practices Act and therefore were subject to personal jurisdiction in Florida).

"Trafficking" in violation of the Act encompasses a broad array of activities, including directing, participating in, or commercially benefitting from trafficking by another person. Specifically, a defendant "traffics" when it "knowingly and intentionally":

33

(i) sells…uses, or otherwise acquires or holds an interest in confiscated property; *or*

(ii) ***engages in a commercial activity using or otherwise benefiting from confiscated property***, *or*

(iii) ***causes, directs, participates in, or profits from, trafficking …by another person, or otherwise engages in trafficking… through another person***

without the authorization of any United States national who holds a claim to the property.

22 U.S.C. § 6023(13) (emphases added). Here, "trafficking" indisputably occurred when the turbines were delivered to Cuba through NAS's confiscated property.

But the statute ***also*** imposes liability on any person (including Defendants) who directed, participated in, or commercially benefited from the trafficking through NAS's confiscated property, and defines such qualifying conduct, wherever it may occur, as independently actionable trafficking under §§ 6023(13)(ii) and 6023(13)(iii). NAS's claims seek to hold Defendants accountable for ***their own trafficking acts*** under these provisions, including trafficking conduct unquestionably directed at Florida through the BIS Loophole Scheme. Defendants, in other words, trafficked by "direct[ing]" and "participat[ing]" in the use of the confiscated property through their actions directed at and in Florida. *Id.*

34

In rejecting conspiracy as a basis for jurisdiction, the R&R first (and correctly) assumed that NAS adequately alleged a conspiracy among Defendants.[4] Dkt. 277 at 19; *see also* Dkt. 189 ¶¶189-94 (alleging conspiracy between Defendants to violate the Act and describing overt actions taken in furtherance of the conspiracy). The court, however, improperly imposed an additional requirement, contrary to black-letter Florida law discussed above, that "a substantial part of Defendants' alleged tortious conduct" must have occurred in Florida, even for conspiracy jurisdiction. Dkt. 277 at 19. *See Execu-Tech*, 752 So.2d at 583-85 (imposing no substantial part requirement for nationwide price-fixing scheme).

In holding that the only relevant trafficking occurred "in Cuba," the Court fundamentally misconstrued the relevant "trafficking" under the Act, contrary to *Del Valle*. There, plaintiffs owned real property in Cuba that had been confiscated and turned into resorts, and the defendants ran booking websites through which individuals could reserve stays at the resorts. 56 F.4th at 1271. Just as here, "[t]he district court dismissed" the plaintiffs' trafficking claims, "ruling that it lacked

---

[4] The elements of civil conspiracy are: "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Koch v. Royal Wine Merchs., Ltd.*, 907 F.Supp.2d 1332, 1346 (S.D. Fla. 2012). An "agreement" for purposes of a civil conspiracy may be express or implied. *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So.2d 1157, 1160 (Fla. Ct. App. 2008).

personal jurisdiction" under the Florida long-arm statute's "tortious act" provision, and "explain[ing] that," in its view, "the tort at the heart of the Helms-Burton Act claims against the [defendants] is 'traffick[ing] in…confiscated property, which occurred in Cuba.'" *Id.* at 1273 (quotation omitted). But this Court "disagree[d]," acknowledging the Act's broad definitions and protections, and explaining that the defendants "trafficked in the confiscated properties" by running websites accessible and accessed in Florida to book accommodations at the confiscated properties. *Id.* at 1273-74; *see also Havana Docks*, 592 F.Supp.3d at 1154 (holding that "there is no threshold level or type of trafficking activity that must occur for liability to attach under the [] Act"). In other words, trafficking may have occurred when the resorts used the confiscated property in Cuba, but it ***also*** occurred in Florida when the booking agencies participated in or commercially took advantage of that use.

Properly viewed through the lens of *Del Valle*, NAS clearly established that one or more co-conspirators, either directly or through an agent, "engage[d] in a commercial activity using or otherwise benefiting from confiscated property," or otherwise "cause[d], direct[ed], participate[d] in, or profit[ed] from, trafficking by another person, or otherwise engage[d] in trafficking…through another person," in violation of the Act. The Miami stopovers were physical stops in Florida to (fraudulently) interact with U.S. Customs officials in Miami, and, as noted above, were themselves unlawful acts of "trafficking" under multiple provisions of the Act.

36

The Miami stops were a "commercial activity" because they were "either a regular course of commercial conduct or a particular transaction or act," 22 U.S.C. §§ 6023(13)(A)(ii), 1603(d), that either "*used*" "the confiscated property," or at minimum, "*otherwise benefit[ed]* from confiscated property," *id.* § 6023(13)(A)(ii) (emphases added). Alternatively, the stops were incidents in which Defendants "cause[d], direct[ed], participate[d] in, or profit[ed] from" the ultimate "use" of the confiscated property when the turbines were unloaded in Cuba, meaning the stops themselves are *again* acts of trafficking under the statutory definition. *Id.* § 6023(13)(A)(iii).

As another, more narrowly focused example, BBC Singapore's actions in planning, analyzing, approving, and directing those Miami stops—including by utilizing Florida port agents regarding the Jade's stop in order to better facilitate the Moonstone's later stop—by themselves constitute trafficking violations under multiple provisions of the Act. *See supra* at 17-19. So, at minimum, BBC Singapore's overt acts directed at Florida taken in furtherance of the conspiracy and in furtherance of getting the "*BBC Jade pushed through Miami*" through the port agents establish personal jurisdiction over all Defendants under Florida law. *Id.* The same analysis applies, for example, with respect to DSV's planning and execution of the BIS Loophole Scheme and the Miami stopovers, including through its Miami office. *See infra* Part II.C.2.

37

Finally, conspiracy jurisdiction does not even require that a co-conspirator know of its co-conspirator's tortious acts directed at or taken in Florida in furtherance of the conspiracy. *Burger v. Hartley*, 896 F.Supp.2d 1157, 1169 (S.D. Fla. 2012) (stating that "[t]o be held liable for the acts of all co-conspirators, each co-conspirator need only know of the scheme and assist in it in some way"). Here, Defendants ***all agreed*** to the Miami stopovers and knew that BIS Loophole Scheme was being directed at or executed in Florida. *See supra* at 10-22. Accordingly, the minimal due process analysis required for conspiracy jurisdiction is satisfied. *See NHB Advisors, Inc. v. Czyzyk*, 95 So.3d 444, 449 (Fla. Dist. Ct. App. 2012) (nonresident defendant's "alleged participation in a conspiracy that aimed its tortious conduct at the state of Florida would allow [defendant] to reasonably anticipate being haled into court in Florida," such that "exercising personal jurisdiction over [defendant] does not offend due process"); *Machtinger v. Inertial Airline Servs., Inc.*, 937 So.2d 730, 736 (Fla. Dist. Ct. App. 2006) ("Directing a conspiracy toward Florida establishes sufficient minimum contacts to satisfy due process."); *Mazer*, 556 F.3d at 1274 (federal courts bound to follow decisions of Florida's intermediate courts on jurisdiction "[a]bsent some indication that the Florida Supreme Court would rule otherwise").

### B.    Tortious Act Jurisdiction Exists Over All Defendants.

In addition to conspiracy jurisdiction, all Defendants are independently subject to jurisdiction for NAS's trafficking claims arising from Defendants' "tortious acts" in Florida. Fla. Stat. § 48.193(1)(a)(2).

### 1.    Defendants Are Subject to Long-Arm Jurisdiction Because They Committed a Violation of the Act in Florida.

Section 48.193(1)(a)(2) "provides that a nonresident defendant is subject to personal jurisdiction for any cause of action 'arising from' a 'tortious act' committed in Florida." *Del Valle*, 56 F.4th at 1272. Here, as discussed above, the relevant "tortious act" is Defendants' statutory violation of the Act, including trafficking conducted through the execution of BIS Loophole Scheme and Miami stopovers. *Execu-Tech*, 752 So.2d at 585 (statutory violations constitute "tortious act" for purposes of long-arm statute); *Williams Elec. Co. v. Honeywell, Inc.*, 854 F.2d 389, 394 & n.5 (11th Cir. 1988) (federal statutory violations constitute tortious activity under the long-arm statute); *Del Valle*, 56 F.4th at 1274 ("At the very least, some of the alleged trafficking took place when Florida residents accessed the websites and made reservations at one or more of the Resorts through those websites.").

The court below held that NAS could not satisfy § 48.193(1)(a)(2) because it did not suffer any injury in Florida. Dkt. 277 at 13. But § 48.193(1)(a)(2) applies to any "tortious act within [Florida]," and lacks any place-of-the-injury requirement. *Metnick & Levy, P.A. v. Seuling*, 123 So.3d 639, 645 (Fla. Ct. App. 2013) ("This

language necessarily focuses analysis not on where a plaintiff ultimately felt damages, but where a defendant's tortious conduct occurred."). Indeed, other provisions of Florida's long-arm statute *do* include a requirement that the plaintiff suffer the injury in Florida. *Compare* Fla. Stat. § 48.193(1)(a)(6) (jurisdiction available over person "[c]ausing injury to *persons or property within this state* arising out of an act or omission by the defendant outside this state…." (emphasis added)).

Here, Defendants' "tortious act"—their statutory trafficking—occurred in Florida, which should be the end of the analysis. As discussed above, "trafficking" is defined broadly under the Act and includes engaging in any "commercial activity using or otherwise benefiting from confiscated property," 22 U.S.C. § 6023(13)(A)(ii), as well as "direct[ing], participat[ing] in, or profit[ing] from, trafficking by another person," *id.* § 6023(13)(A)(iii). Defendants here trafficked under the Act in Florida by orchestrating the BIS Loophole Scheme, engaging port agents in Miami, and directing the transport of the turbines through Miami. These actions were commercial activities that benefited from the ultimate use of Puerto Carupano. By planning and executing the BIS Loophole Scheme and directing the transport of the turbines through Miami, Defendants also "directed, participated in, or profited from, trafficking" by others, including GE and Energoimport.

40

Because the court viewed the only relevant trafficking to have occurred "in Cuba"—a framework that *Del Valle* rejected—it ignored the elephant in the room: The BIS License Scheme was the ***foundation*** of Defendants' trafficking and was conduct that commercially benefited from the use of the port in Cuba. In other words, trafficking "in Cuba" is perhaps the beginning of the analysis, but the Act expressly permits NAS to assert claims, in Florida, against persons who, through actions in or directed at Florida, direct, participate in, or commercially benefit from that trafficking. Moreover, that Defendants *also* engaged in trafficking in other locations outside of Florida does not somehow negate their Florida-based trafficking or jurisdiction in Florida. Again, *Del Valle* answers this question: the booking agencies trafficked through their operation of nationwide websites, but they were subject to jurisdiction under the long-arm statute because "[a]t the very least, ***some*** of the alleged trafficking took place" in Florida. 56 F.4th at 1274 (emphasis added). The same is true here.

## 2.    Defendants' Actions Involving Florida Were Essential to the Success of the Tort.

The court below held that NAS could only rely on "tortious act" jurisdiction if a "substantial aspect" of Defendants' tort occurred in Florida. Dkt. 277 at 12. Even if this is the applicable standard, jurisdiction is proper here because a "substantial aspect" of Defendants' overall tort occurred in Florida. Here again, the court below erred by (i) entirely ignoring Defendants' premeditated stopovers in Florida, and

41

(ii) then holding that because the entirety of Defendants' trafficking occurred "in Cuba," NAS could not make such a showing. Dkt. 277 at 13-14.

Where tortious activity occurs across state lines, rather than only in Florida, jurisdiction in Florida is proper where the plaintiff "demonstrate[s] that the non-resident defendant committed a substantial aspect of the alleged tort in Florida." *Williams*, 854 F.2d at 394 (internal quotation marks omitted). A substantial aspect of a tort occurs in Florida if the defendant's actions in or directed at Florida were "essential to the success of the tort." *Watts v. Haun*, 393 So.2d 54, 56 (Fla. Dist. Ct. App. 1981); *see also, Cable/Home Comm'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 857 (11th Cir. 1990) (use of Florida travel agent "essential" for promoting offshore summit where defendants organized copyright piracy scheme, rendering defendants subject to "tortious act" jurisdiction in Florida).

*Watts* is instructive. There, the plaintiffs sued a New York resident (Watts) in Florida for the tort of wrongful interference with an expected gift of stock from Watts's father. 393 So.2d at 55-56. The complaint alleged that Watts traveled to Florida in June 1978 and transported her father from Florida to a rest home in New York. *Id*. at 55. Once in New York, Watts wrongfully obtained her father's signature on a stock certificate, thwarting the plaintiffs' expected gift of the stock and pocketing it for herself. *Id*.

42

The court held that Watts was subject to jurisdiction for her tortious act in Florida. *Id.* at 56. The court recognized that "[a]t first blush, it might appear that the tort was actually consummated when [Watts] obtained [her father's] signature on the stock power back in New York." *Id.* And the court noted that "[f]rom a chronological standpoint, most of Mrs. Watts' activities took place outside of Florida." *Id.* Yet jurisdiction was available in Florida because the plaintiffs alleged the wrongful interference to have occurred from June 1978, in Florida, through the signing of the stock certificate in December 1978, in New York. In other words, the complaint alleged a "continuing tort" and was "sufficiently broad to infer that Mrs. Watts' trip from New York to [Florida] *was part of the scheme* to thwart [her father's] desire to give the stock to the plaintiffs." *Id.* (emphasis added). Put another way, "Mrs. Watts *had to come to Florida* in order to accomplish" her tortious objective, rendering Florida activities "*essential* to the success of the tort." *Id.* (emphasis added).

The same is true here. Like Watts, who "had to come to Florida in order to accomplish" her overall scheme to thwart her father's gift of the stock to the plaintiffs, Defendants "had to come" to Miami in order to accomplish their scheme's overall objective of delivering the shipments to the confiscated property. Defendants' actions in and directed at Florida were, by definition, *essential* to the success of the tort. Indeed, it is uncontested that Defendants' stopovers in Miami

were the ***only way*** for Defendants to get the shipments to Cuba and around U.S. trade requirements. In fact, Goldwind approved the Miami stopover as a precondition to executing the Blade Supply Agreement, while DSV admitted that the filing of customs forms in Miami was "the ***foundation*** of the entire project." *See supra* at 10-13; Dkt. 218-51 at 8.

Accordingly, the court erred by holding that NAS failed to show that Defendants' Florida-based activities were a substantial aspect of the trafficking tort.

> **C.    The "Business Activity" Provision of Florida's Long-Arm Statute Is Satisfied as to DSV.**

> > **1.    The District Court Erred by Relying on DSV's Self-Serving Declaration.**

On a Rule 12(b)(2) motion to dismiss, where the plaintiff's complaint and supporting evidence conflict with the defendant's evidence, "the court must construe all reasonable inferences in favor of the plaintiff." *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002).

Here, after the close of jurisdictional discovery, and in connection with their motion to dismiss, DSV filed a conclusory, self-serving declaration signed by Ken Witkowski (the "DSV Declaration") that purports to absolve DSV of any wrongdoing or Florida-directed conduct. Dkt. 201-1 at 2. The declaration claimed:

> (1)    DSV did not consult, communicate, or coordinate with any other Defendant or Energoimport regarding the shipments, *id.* ¶11;

(2)   DSV's involvement in the shipments was limited to conferring outside of Florida regarding an export license issue and transmitting forms to customs officials from outside Florida, *id.* ¶17;

(3)   DSV filed ISF-5s from New Jersey and the ISF-5s did not list DSV's Miami address, *id.* ¶18;

(4)   No one from DSV's Florida office worked on the shipments, *id.* ¶¶19-20;

(5)   DSV's Florida-based customs specialist, Scheid, did not take any action related to the vessels, *id.* ¶25; and

(6)   DSV did not agree to transport equipment from China to Cuba, *id.* ¶26.

NAS moved to strike the DSV Declaration, arguing it contradicted DSV's earlier deposition testimony. Dkt. 220 at 11, 15-17. The magistrate judge denied the motion, holding that NAS's objections to the DSV Declaration "go to the weight of the evidence and Defendants' credibility, which the Court can evaluate if necessary in ruling on the Motions to Dismiss." Dkt. 258 at 3 (cleaned up).

Two months later, the magistrate judge issued the R&R. Contrary to the earlier guidance that NAS's vigorous objection to the DSV Declaration would be considered by the court in resolving the motion to dismiss, the court instead relied *solely* on the "averments" made in the DSV Declaration. Dkt. 277 at 10-12. In other words, contrary to the Rule 12(b)(2) standard, the R&R (and later the district court)

relied on DSV's word, and ignored directly contrary evidence cited by NAS, such as emails sent and received by DSV's ***own*** declarant, including:

(1)  DSV used its Miami's address and phone number on the ***two separate*** ISF-5s prepared for U.S. Customs in connection with the Jade's Miami stopover:



Dkts. 218-47 at 3; 218-48 at 3; 218-26 at 129:5-131:15.

(2)    On its Miami office letterhead, DSV *twice* provided written instructions directly to Energoimport regarding the necessity, requirements, and mechanics of filing the ISF-5 for the Jade:



Friday, October 26, 2018

**DSV**

DSV Air & Sea Inc. 1701 N.W.
87th Avenue  Suite 200  Miami,
Florida  33172

(305) 477-6800
(305) 477-6971

Empresa Importadora-Exportadora de Objetivos
Electroenergeticos,
ENERGOIMPORT  Amenidad No. 124 entre
Nueva y 20 de Mayo, La Habana, Cuba Francisco
Dias Ponce Tel 0053 52171217

**SUBJECT:  US Customs Importer Security Filing (ISF)**

Dear Valued Customer:

Dkts 218-48 at 2; 218-47 at 2; 218-26 at 129:5-131:15.

(3)  DSV forwarded an email directly and solely to Scheid in Miami discussing "reservations in regards to compliance" with shipping the cargo through Miami to avoid licensing requirements. Dkt. 218-25 at 2-3.

(4)  Ultimately, twenty emails were sent to Scheid in Miami with the subject: "LM Blades from China to Cuba via US" regarding, among other things: the necessity of the Miami stopovers, shipment strategy, the BIS license, the ISF-5s and their filing, and the legality of the shipments. Dkt. 218-29 at 2-19.

(5)  DSV knew that the Miami stopovers were being used to try to meet U.S. regulatory requirements. Dkt. 218-26 at 97:10-19.

48

(6)    From Miami, Scheid was involved in correspondence regarding the stopovers. Dkt. 220-7 at 90:5-96:10.

There can be no dispute: evidence put forward by NAS directly conflicts with DSV's self-serving declaration. Yet after first declining to strike the DSV Declaration, the R&R went out of its way to rely solely on DSV's averments over NAS's contradicting evidence, including that DSV was demonstrably involved in the BIS Loophole Scheme and the Miami stopovers. Dkt. 277 at 11. This was clear error on DSV's Rule 12(b)(2) motion to dismiss. *AcryliCon*, 985 F.3d at 1364.

## 2.    Viewed Through the Proper Lens, NAS's Claims Arise From DSV's Florida Business Activities.

Florida's long-arm statute provides jurisdiction over "any cause of action arising from…operating, conducting, engaging in, or carrying on a business or business venture in [Florida,] or having an office or agency in [Florida]." Fla. Stat. § 48.193(1)(a)(1). "To establish specific jurisdiction…, the business activity must demonstrate a general course of business for pecuniary benefit connected with the alleged tort." *Alston v. www.calculator.com*, 476 F.Supp.3d 1295, 1313 (S.D. Fla. 2020) (internal citations omitted). The "arising from" language requires a connection between the alleged tort and the Florida business activity. "The term arising from is broad; it does not mean proximately caused by, but only requires a direct affiliation, nexus, or 'substantial connection to exist between the basis for the cause of action

and the business activity." *Citicorp Ins. Brokers (Marine), Ltd. v. Charman*, 635 So.2d 79, 82 (Fla. Dist. Ct. App. 1994) (internal citation omitted).

Here, the evidence—viewed through the proper Rule 12(b)(2) lens—clearly reflects that NAS's claim against DSV "arises from" its Miami business activities. It is undisputed that at the time of the shipments, DSV maintained Florida offices, including a Miami office, and DSV's only business in Florida was providing transportation logistics services for pecuniary benefit. Dkt. 201-1  ¶¶3-6. As discussed in detail above, *see supra* at 10-22, because the turbines were manufactured by the subsidiary of a U.S. company, successfully shipping the turbines to Cuba was not your ordinary logistics mission. Thus, DSV and the other Defendants concocted the BIS Loophole Scheme, whereby the turbines would first be shipped from China to Miami. *See supra* at 10-11. Then—after stopping in Miami to bunker, refuel, and most importantly, declare the turbines to U.S. Customs through ISF-5s so that the turbines would arguably qualify as US exports under General Electric's BIS license—the ships would continue from Miami to Cuba. *Id.*

The BIS license permitting Defendants to categorize the turbines as exports *from* the United States was the linchpin of the BIS Loophole Scheme. And ***the only way to*** technically categorize the turbines as U.S. exports under the BIS license was to file ISF-5s at the Port of Miami. *Id.* In short, without the submission by DSV of the ISF-5s to authorities in Miami, the BIS Loophole Scheme would have been

impossible. *See supra* at 10-22. Indeed, as DSV admitted in contemporaneous emails, the ISF-5s were the "***foundation*** of the entire project" Dkt. 218-51 at 8 (emphasis added). Given the importance of the ISF-5s and the fact that the Jade and the Moonstone were stopping in Miami, it makes perfect sense (and as the evidence shows) that DSV utilized its Miami office address on letters to Energoimport about the filing of the forms and on the forms themselves. *See supra* at 44-49.

Moreover, beyond using the Miami office address on correspondence and customs forms, DSV also specifically tasked Scheid, its Miami-based specialist, with the project. Scheid was involved from the outset and through the duration of the shipments. On February 23, 2018, Robert Boswell (from DSV's New Jersey office) forwarded the initial inquiry to assist in shipping the turbines "from China to Cuba, with a layover in Miami" directly and solely to Scheid. Dkt. 218-25 at 2-3. Thereafter, over the next eight months, Scheid received ***twenty*** emails regarding the strategies for shipping the turbines from China to Cuba through Miami. Dkt. 218-29 at 2-18. Unsurprisingly, DSV confirmed Scheid's involvement in the Miami stopovers. Dkt. 220-7 at 90:5-96:10.

At bottom, evidence available at this early stage demonstrates that NAS's claims arise from DSV's Miami-based business activities. Between (1) the use of DSV's Miami office for the ISF-5s; (2) the related written communications addressed to Energoimport (the recipient of the turbines in Cuba) from DSV's Miami

51

office; and (3) the involvement of DSV's Florida-based specialist, there is no question that the broad "arises from" nexus is met. Indeed, this is not a case where DSV's Florida-related business activities were attenuated from NAS's tort claim. On the contrary, NAS's claims against DSV *arise directly from* DSV's specific business activities in Florida on the Jade and Moonstone shipments.[5] The court below therefore erred in relying solely on averments made in the DSV Declaration over NAS's countervailing evidence of DSV's related business activities in Florida.

## III.    The Exercise of Jurisdiction Does Not Violate Due Process.

The district court erred in concluding that exercising jurisdiction over Defendants would violate due process.[6] Dkt. 277 at 15-18. The district court could only reach this conclusion by ignoring evidence and misconstruing the law.

"At bottom, due process prohibits the exercise of personal jurisdiction over a nonresident defendant unless its contacts with the state are such that it has fair

---

[5] The R&R relied in part on *Saft America, Inc. v. Jabil Circuit (Guangzhou), Ltd.*, 2019 WL 4600401, at *6 (M.D. Fla. Sept. 23, 2019). Dkt. 277 at 11. There, the out-of-state defendant had a single employee in Florida who was not involved in the sale of the defective products at-issue in the litigation. Here, by contrast, DSV's Florida business activities from its Miami office are directly related to NAS's claim.

[6] Because Goldwind and BBC Singapore are foreign Defendants not subject to general jurisdiction in any state, the Court may exercise jurisdiction over them if "consistent with the United States Constitution and laws." *Del Valle*, 56 F.4th at 1274 n.3; *see also* Fed. R. Civ. P. 4(k)(2). This analysis under the Fifth Amendment and Rule 4(k)(2) tracks the "same basic principles that apply" to the other Defendants "under the Fourteenth Amendment." *Del Valle*, 56 F.4th at 1274 n.3.

warning that it may be subject to suit there." *Del Valle*, 56 F.4th at 1275. "In specific jurisdiction cases like this one, [the court] examine[s] whether (1) the plaintiff's claims arise out of or relate to one of the defendant's contacts with the forum state; (2) the nonresident defendant purposefully availed itself of the privilege of conducting activities within the forum state; and (3) the exercise of personal jurisdiction is in accordance with traditional notions of fair play and substantial justice." *Id.* (cleaned up). NAS satisfies each prong.

## A.    The Trafficking Claims Arise Out of or Relate to Defendants' Contacts with Florida.

"The first prong—which addresses the concept of relatedness—focuses on the causal relationship between the defendant, the forum, and the litigation." *Del Valle*, 56 F.4th at 1275 (cleaned up). However, "[d]irect causation is not required." *Id.* Instead, the claims need only "arise out of *or relate* to the defendant's contacts with the forum." *Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021) (emphasis in original).

As in *Del Valle*, "[t]his prong is readily met here." 56 F.4th at 1275. In *Del Valle*, the plaintiffs' claims arose "at least in part directly out of the contacts of the [booking agencies] with Florida—the promotion targeted at and directed to Florida residents, the accessing of their websites by Florida residents, and the use of those websites by some Florida residents to book accommodations at the Resorts." *Id.* Here, as discussed in detail above, NAS's claims arise from—or at the very least,

relate to—Defendants' meticulously planned stopovers in Miami as they transported the turbines to the confiscated property in Cuba. This is not an action where the plaintiff points to a defendant's attenuated connections to an unknown forum. Rather, Defendants specifically targeted Florida (and only Florida) through the BIS Loophole Scheme, and NAS's trafficking claims relate to those contacts.

Here again, the district court's incorrect holding that the trafficking occurred solely "in Cuba" tainted its due process analysis. As shown throughout this brief, Defendants had ample contacts with Florida—contacts that were directly related to the BIS Loophole Scheme. This action is therefore nothing like the trafficking claim in *Herederos de Roberto Gomez Cabrera, LLC v. Teck Resources Ltd.*, 43 F.4th 1303, 1311 (11th Cir. 2022), where the court could not constitutionally exercise jurisdiction over a Canadian mining company that lacked *any* contacts whatsoever with Florida.

The district court faulted NAS because Goldwind, BBC Singapore, and BBC USA do not have "offices, employees, bank accounts, telephone numbers, mailing addresses, or registered agents in Florida." Dkt. 277 at 16. But that is not the test, and conflation of "minimum contacts" with a physical-presence requirement was reversible error. *Cf. Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-81 (1985). As the Supreme Court has long explained, "physical presence in the forum is not a prerequisite to jurisdiction." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). All that is

required is that the defendant took some action with respect to the forum making it reasonably foreseeable that it could be called to answer for its conduct there. *Burger King*, 471 U.S. at 480. At the very least, Goldwind, BBC Singapore, and BBC USA did so here through their participation in the BIS Loophole Scheme and role directing the turbines through Miami, including by using agents in Florida. Finally, as discussed above, because at least one co-conspirator committed a tortious act in Florida, due process permits the exercise of jurisdiction every other co-conspirator. *NHB Advisors*, 95 So.3d at 449.

### B. Defendants Purposefully Availed Themselves of the Privilege of Conducting Activities in Florida.

"As to the second prong—which concerns purposeful availment—there are two applicable tests: the effects test and the minimum contacts test," the latter of which is applicable here. *Del Valle*, 56 F.4th at 1275. "The minimum contacts test assesses the nonresident defendant's contacts with the forum state and asks whether those contacts (1) are related to the plaintiff's cause of action; (2) involve some act by which the defendant purposefully availed himself of the privileges of doing business within the forum; and (3) are such that the defendant should reasonably anticipate being haled into court in the forum." *Id.* At 1276. Here, the minimum-contacts test is met as to each Defendant.

*First*, as noted above, Defendants' BIS Loophole Scheme and decision to transport the turbines through Florida is directly related to NAS's trafficking claim.

55

*See Id.* (plaintiffs' claims based "in part" on booking agencies' Florida-related contacts).

*Second*, Defendants purposefully availed themselves of the privileges of conducting business in Florida, and reasonably could have foreseen being haled into court there. In the lead-up to the shipments, Goldwind was specifically concerned about whether the Miami stopovers could result in its cargo being detained by authorities. Dkt. 218-46 at 2. BBC Singapore used agents in Florida and similarly was worried about the possibility of getting "in trouble with uncle sam" through the plan "to 'clear' the vessel in Miami." Dkt. 218-33 at 2. BBC Singapore even considered shuttering the Moonstone's electronic tracking systems during the voyage *into* Miami, before realizing it could cause "trouble with the U.S. coast guard" and draw unwanted "attention" to the shipment. Dkts. 218-62 at 3; 218-64. And DSV was acutely aware of the regulatory implications of using the stopovers in Miami to avoid procuring an OFAC license.

Defendants, in other words, had "clear notice" and "fair warning" that their intended activities directed at Florida could subject them to the state's courts. *Ford*, 141 S. Ct. at 1025. Moreover, Defendants' contacts with Florida were neither fortuitous nor random. Defendants had ample opportunity to "structure [their] primary conduct to lessen or avoid exposure to" Florida's courts. *Id*. But after months of analysis, Defendants specifically elected to use the Port of Miami to

effectuate their BIS License Scheme. Being haled into court in Florida on related claims is a reasonable consequence of their clear-eyed election. *Williams*, 854 F.2d at 393 (defendants "could have acted differently had they wanted to alleviate [] risk" of defending against claims in Florida). Indeed, it is hard to imagine a clearer instance of a defendant specifically seeking out a forum to "purposefully invoke[] the benefits and protections of a State's laws." *Burger King*, 471 U.S. at 482 (citation omitted).

In addition to their trafficking-related Florida contacts, Goldwind and BBC Singapore's contacts with the U.S. as a whole are relevant to the due process analysis. *Herederos*, 43 F.4th at 1310. Here, the contacts are substantial. Goldwind Science owns assets in the United States worth $247 million; has filed for 34 U.S. patents; has ██████████████████████████████████████████ ██████; and initiated a four-year arbitration proceeding in Chicago that finished the same year that Goldwind shipped the turbines. Dkts. 189 ¶18; 218-95 at 3; 218-96; 218-5 at 47:11-48:24, 52:4-14. Goldwind International has ██████████████ ███████████████████████████; formerly owned (with Goldwind Science) a wind farm in Montana, which it continues to service; has ██████████████ ███████████████████████████ and initiated the Chicago arbitration. Dkts. 218-92 at 48:17-23; 218-94; 218-95 at 3; 218-96; 218-5 at 47:11-48:24, 52:4-14. And BBC Singapore frequently acts as an "agent in connection with

shipments by vessels that have loaded or unloaded goods in Florida or other U.S. ports"—including at least 180 U.S. stops from 2017 to 2020, including 70 involving Florida. Dkts. 50-1 ¶22; 218-21 at 16:10-17, 70:13-71:17.

### C. Jurisdiction Comports with Fair Play and Substantial Justice.

Finally, Defendants cannot satisfy their burden to "make a compelling case that exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Del Valle*, 56 F.4th at 1275. This inquiry considers: "(1) the burden on the defendant; (2) the forum's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; and (4) the judicial system's interest in resolving the dispute." *Id.* at 1277 (cleaned up). These factors weigh in NAS's favor.

No Defendant offered evidence of any burden of litigating in Florida, Dkts. 197 at 24; 198 at 19; 201 at 24; 202 at 19-20, because there is none. *Del Valle*, 56 F.4th at 1277 (prong met where defendants had not "offered any evidence" of being "burdened by having to litigate the case in Florida"). Defendants all routinely engage in commercial activities in the U.S., like shipping, arbitration, and the provision of services. It cannot be unconstitutionally inconvenient to litigate NAS's claims in that same forum.

Moreover, Florida and the U.S. have significant interests in the prosecution of claims arising out of acts of illegal trafficking and conspiracy targeted at and

occurring in Miami, trafficking that included misleading U.S. Customs officials in Miami. *Del Valle*, 56 F.4th at 1277; *see also* 22 U.S.C. § 6081(11) (congressional finding that "United States nationals who were the victims of…confiscations should be endowed with a judicial remedy in the courts of the United States"). And, of course, the U.S. and Florida have an interest in enforcing the trade embargo and OFAC licensing regime. There is nothing unfair about Defendants being called to account in Florida.

## CONCLUSION

The Court should reverse and remand so this case may proceed to the merits.

Dated: April 26, 2023                    Respectfully submitted,

/s/ *Craig A. Boneau*
William T. Reid, IV
Craig A. Boneau
Ryan M. Goldstein
REID COLLINS & TSAI LLP
1301 S. Capital of Texas Hwy, C-300
Austin, Texas 78746
T: 512-647-6100
F: 512-647-6129
wreid@reidcollins.com
cboneau@reidcollins.com
rgoldstein@reidcollins.com

*Counsel for Plaintiff-Appellant*
*North American Sugar Industries Inc.*

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,984 words. This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5)-(6) because it was prepared in a proportionally based typeface using Microsoft Word 2019, 14-point Times New Roman.

Dated: April 26, 2023              /s/ *Craig A. Boneau*_____
                                   Craig A. Boneau

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of April, 2023, a true and correct copy of the NAS's redacted, opening brief was filed electronically and served on all counsel through this Court's CM/ECF system, with a true and correct copy of the unredacted opening brief served on all counsel of record via email.

*/s/ Craig A. Boneau*
Craig A. Boneau